### SPILLERS v. SOUTH ATLANTIC S. S. CO. OF DELAWARE.

#### Civil Action No. 169.

District Court, D. Delaware.

May 21, 1942.

W. T. Knowles, of Wilmington, Del., for plaintiff.

William S. Potter, of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is an action under the Jones Act, 46 U.S.C.A. § 688, to recover (1) damages for alleged negligence and (2) wages, maintenance and cure.

Plea: Release. *(See footnote)

---

*Full Release of All Claims

For and in consideration of the sum of One Hundred and No/100 Dollars, lawful money of the United States of America, to me in hand paid, receipt whereof is hereby acknowledged, I, Albert L. Spillers, age 21, have remised, released and forever discharged, and by these presents for myself, my heirs, executors and administrators, do remise, release and forever discharge The South Atlantic Steamship Company of Delaware and the several steamships of the said Company, their officers and crews, their heirs, executors, administrators and assigns, and in particular the Steamship "Sundance", its owners, operators, agents, charterers, servants, masters, officers and crews, and underwriters, of and from all, and all manner of actions, suits, liens, debts, trespasses, damages, injuries, wages, sums of money, controversies, agreements, claims and demands whatsoever, in law or in admiralty, against which Company or any steamship thereof, or running in said line, I ever had, now have, or may have, for, upon, or by reason of any matter or thing whatsoever from the beginning of the world to the date of these presents; and particularly, but not exclusively, for all losses, injuries or damages arising out of or connected with an illness which I claim to have contracted while a seaman on board s/s "Sundance" on or about January 19th, 1939, which is or may turn out to be pneumonia, tuberculosis, an abscess, or some other illness or disease, including transportation, wages, maintenance and cure.

I know that I am signing a release for wages, transportation, maintenance and cure and also for damages and that I am taking the risk that I may have other injuries from the illness that I do not know of and that the illness I do know of may be, or may turn out to be worse than they seem to me now. I accept these risks and realize that *this is a release of all claims.* I am not influenced to make this settlement by any threat or promise. Have you read this and do you understand it?     Yes     . Has this pa-
(Yes or No)
per been read *to you and do you under-*

stand it?  _____
(Yes or No)

In witness whereof, I have hereunto set my hand and seal this 11th day of February, 1939. (Signed) Albert L. Spillers

This is a full release          (L.S.)

---

Address: 113 E. Gwinnett St.,

Savannah, Ga.

---

Witness as to
Claimant's signature:
(Sgd.) E. H. Wilson
(Sgd.) L. G. Bailey
Notary Public
County of Chatham
State of Georgia.

Replication: Fraud, i. e. that the release was procured by fraud.

No proof to support the claim for damages arising from defendant's negligence was offered.

The sole issue is the validity of the release pleaded.

Plaintiff, Albert Spillers, is a native of Georgia and a resident of Savannah. Defendant, South Atlantic Steamship Company of Delaware, operating a coastwise and trans Atlantic steamship line, has its principal place of business at Savannah.

Spillers entered defendant's employ as a merchant seaman in January, 1937, before completing high school. For a minor he was unusually sturdy and agile. At the time of his employment he weighed around 175 pounds holding the title of Southern Lightweight Champion and ranking second in school tennis. January 13, 1939, plaintiff sailed on the s/s Sundance from Savannah on a coastwise trip stopping at Brunswick, Georgia and at Jacksonville, Florida. He fell ill at the latter port. Using his own words, he " * * * took sick in Jacksonville, Florida on a Saturday [January 21, 1939] when we arrived in Jacksonville, and I complained and received no doctor". It was the practice aboard ship to obtain a certificate from the chief mate to entitle a seaman to consult a Government physician, but Spillers could not locate the chief mate. He says: "Then I didn't find the chief mate so I paid for a doctor out of my own pocket. He told me to go to bed. The next morning, Monday [January 22] they carried me in the assistant engineer's car. They came back and got me out of the bunk and carried me to the doctor's office in a Government building * * * in Jacksonville. This doctor took my temperature and told me that I had a high temperature, but I couldn't go back to work on the ship, that I had to go into the hospital; and I begged to send me to Savannah. He sent me to Savannah and he told me it was all right if I would go in the hospital * * *. Monday night I was in Savannah." Tuesday, January 23, Spillers entered the Government hospital at Savannah where he remained a month or two.

The period from January 23 to February 7, 1939, is covered by contemporary entries made by the hospital physicians in the hospital clinical record from which an abstract was taken. This abstract was admitted in evidence as plaintiff's Exhibit No. 1 and is signed S. P. Sanford, A. A. Surgeon, U. S. Public Health Service, U. S. Marine Hospital, Savannah, Georgia; Approved, Ralph E. Porter, Senior Surgeon in Charge. The abstract is crowded with entries respecting Spillers' condition. Under the caption "Condition of Patient upon Admission" and under the subcaption "History—Cough and fever" the entries are: "Present illness began 3 days ago with cough, pain in chest on right side under ribs and shoulder blade. Raises a little sputum, purulent. There has been fever for 2 days before coming here. Appetite is poor, Bowels are loose, no hemmorrhoids, no history of jaundice, G. U. No nocturia. N. M. No joint pains. No headaches."

The day after Spillers entered the Government hospital at Savannah he was X-rayed. Respecting this, the entries are: "X-ray findings: 1/24/39.

"There is a triangular area of increased density in the right upper lobe, which extends outward from the upper border of the hilus area at the level of the 2nd rib anteriorly. The appearance is rather suggestive of a pulmonary infarct, but may be due to an early pneumonia. There is a small area of softening in the outer lower border of this density, suggestive of a cavity, which makes abscess a possibility. Reexamination in a few days may clear up the diagnosis."

Practically all the entries related to the patient's lungs and infiltration thereof. From the start the possibility of "abscess" was indicated. However, "Re-examination in a few days may clear up the diagnosis" was suggested.

Six days later, a second X-ray test was taken: "X-ray 1/30/39—The small wedged shaped area of infiltration in the right upper lobe remains unchanged since the last examination January 24th, 1939. I believe this would rule out an ordinary pneumonia, leaving the diagnosis between abscess and tuberculosis." Finally, the "Condition of Patient on February 7–1939" was reported as "Improved" with the further entries: "Physical examination negative except the following: Gen. appear: Poorly nourished white male. Throat—Tonsils have been removed. There is now a granular Pharyngitis with acute tenacious exudate. Thorax Poorly covered. Sunken apices. Lungs: Asthmatic wheezes throughout. Inspiration difficult. Glands: Inguinal—shotty." Laboratory findings: "Urinalysis—reaction—acid. Albneg. Sugar—neg. Feces—neg. Sputum—negative,

for tubercle bacilli. Many bacteria and many pus cells. Blood—white corpuscles, 7050. Sm. mon—20%. Neut—80%. Wass. and Kahn—both neg."

While Spillers was in the hospital a patient in an adjoining bed told him about workmens' right to compensation under the Federal Employers' Liability Act. Acting on this information Spillers got in touch with defendant's claim agent. Quoting plaintiff's own words. When asked:

"Q. How did you first get in touch with Mr. Wilson? A. I was told that there was a fellow that was sick off a ship working for a corporation, that he would have compensation, that I could get compensation for while I was sick; so I didn't know anything about it. This fellow talked to me, just a regular patient there.

"I said, 'Golly', I said, 'if the man will talk to me tell him to come on down; I will talk to him if he will come on down.'

"Q. Were you in bed at the time? A. Yes, sir.

"Q. And so Mr. Wilson was called? A. Yes, sir, he was called.

"Q. Anyway, he came to the hospital; is that true? A. Yes, sir.

"Q. And what did he say to you the first time you saw him? A. The first time I saw him he came into the hall, I was called from the bed and went down and talked to him in the hall. * * * I was called and told that Mr. Wilson was to see me, and he was downstairs in the hall, and I put on my bathrobe and went down and he asked me what was my trouble, and I told him, and he asked me what was I asking of the company, that the company was not responsible.

* * * * *

"I said, 'I didn't quit of my own accord', and he asked me, he says, 'What do you want'?

"I told him I would like to get $500 out of it. He said, 'Oh, no, that's too much. What's wrong with you?'

"I told him that I had had pneumonia and that I didn't know what was wrong with me, and he asked me to get a clinical abstract of my ailment.

* * * * *

"A. He asked me to get a clinical report [abstract] of my record so that he could see it, what was wrong with me.

"I also told him, I said, 'If I get any money out of it', I said, 'they docked me for Sunday night's pay, because I wasn't able to work on Sunday night in Jacksonville, and I was docked for it.'

"He told me he would get that for me too, and then he told me he hoped I got better and for me to get that for him as soon as possible and let him have it and he would see what he could do for me.

"Q. And you got that report [abstract]? A. Yes, sir.

"Q. Was that report [abstract] sent to Mr. Wilson? A. Yes, sir.

* * * * *

"Q. Was that clinical report [abstract] delivered to you so that you could read it? A. Yes, sir.

* * * * *

"Q. When you received that report [abstract] you read it? A. I read it, yes, sir.

"Q. What did it mean to you, if anything? A. Naturally to me it didn't mean anything. I am not a doctor. It was all in medical terms.

"Q. Had you been told by the doctor at the time Mr. Wilson first visited you what was wrong with you? A. No, sir.

"Q. What did you understand was wrong with you? A. Well, I distinctly understood that I had the starting of pneumonia and that I would be all right and go back to work very soon. I knew that from the way I was told.

"Q. Did Mr. Wilson visit you a second time? A. Yes, sir.

"Q. Do you recall when that was? A. That was about three or four days after I gave him that abstract."

Wilson was the claim agent of the steamship company, the defendant. Drawing releases and procuring their execution was in the line of his employment. It was part of his duty to understand medical terms and to employ them in releases. Very naturally he asked Spillers, "What's wrong with you?" and also asked him "to get a clinical report [abstract] of his hospital record so that he could see what was wrong with" him. The entries in the abstract have been recited. They answer the claim agent's questions. Did the claim agent read the answers as he was in duty bound to do or did he do nothing about it but "just held the abstract"?

The claim agent believed that he had a right to deal at arm's length with Spillers. Believing that he was acting only on behalf of defendant, Wilson very naturally copied the most significant passages from the abstract into the release. In so doing he en-

larged the scope of the release with the words "and particularly but not exclusively for all losses, injuries or damages arising out of or connected with an illness which I claim to have contracted while a seaman on board s/s Sundance on or about January 19, 1939 which is or may turn out to be pneumonia, tuberculosis, an abscess or some other illness or disease including transportation, wages, maintenance and cure."

Wilson phrased the release to broaden to the limit the scope of defendant's liability. In his testimony Wilson narrowed that liability to the limit: "I figured that the man would possibly be an outpatient for about 30 days. The customary allowance for a man for 30 days would be about $2.00 a day. That would be about $60.00, and to give him the benefit of the doubt I gave him another $40.00; in round figures $100.00 * * *. I thought in 30 days he would be back at work, within 30 days. That is what my opinion was from the clinical abstract."

If Spillers knew that he was afflicted with an abscess of the lungs or with tuberculosis, it is incredible that he would release the company from liability therefor by accepting $2 a day for 30 days with a small gratuity. This position is thoroughly confirmed by the law applicable thereto. The claim agent bears a fiduciary relation to a seaman in negotiating a settlement of liability for an ailment contracted in the service of the ship. The duty imposed upon the claim agent is to tell the seaman the facts within his knowledge respecting the seaman's condition. On February 11 Wilson knew that Spillers' condition was serious. He knew Spillers was afflicted with an abscess of the lungs or with tuberculosis. Did he tell him? He did not. On February 15, only four days later, the hospital doctor "walked up to [Spillers'] bed and * * * told [him] he had tuberculosis * * * and that they would have to move [him] out of the medical ward."

### Law

Judge Story's law writing and lecturing as well as his judicial work led him into the civil law of Europe and gave him a unique mastery of continental jurisprudence. He spoke with particular authority in maritime cases respecting the rights of seamen. While sitting in the First Circuit in Harden v. Gordon et al., he said:

"Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and are easily overreached. But courts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees. They are considered as placed under the dominion and influence of men, who have naturally acquired a mastery over them; and as they have little of the foresight and caution belonging to persons trained in other pursuits of life, the most rigid scrutiny is instituted into the terms of every contract, in which they engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage had been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.

* * * * *

"But it is insisted, in the last place, that the claim, whatever might have been its original validity, has been completely adjusted and settled by the parties. And a receipt, given by the libellant, is relied upon as satisfactory proof of the fact. In respect to instruments of this nature, however general and comprehensive their terms may be, there is no pretence to say, that they have a binding and conclusive effect. The most, that can be attributed to them, is, that they afford prima facie evidence of all, that they purport to declare, and that they are to stand, until overthrown by counter proof from the other party. They do not arrogate the high prerogatives, which the common law has attributed to releases under seal; and even these may be set aside in equity, when surprise, fraud, mistake, or undue influence have intervened to the material injury of the party." Harden v. Gordon et al., 11 Fed.Cas. No. 6,047, pages 480, 485, 487.

I accept and adopt the law, laid down by Judge Story, that Spillers under the circumstances of this case should be treated in the same manner as "Courts of Equity are

accustomed to treat, young heirs dealing with their expectancies, wards with their guardians and cestuis que trust with their trustees". For example, if Spillers, being a seaman and a ward, and his guardian should draft a release, phrased in the first person as here, making Spillers declare that for a pittance of $100 he released a claim for damages for an ailment of which Spillers was wholly ignorant but of which the guardian had authentic information, a court of equity would declare the release void because procured by fraud.

I rest this opinion upon the suppression of the truth by defendant's claim agent. There is no contradiction of the fact that Wilson in negotiating the release on February 11, 1939, did not disclose to plaintiff the information he already had obtained from the abstract.

### Findings of Fact

1. That Wilson was a claim agent of defendant and from long experience knew the meaning of the medical terms used in the abstract of the record of Spillers case, kept in the Marine Hospial at Savannah.

2. That on February 15 plaintiff was informed by the physician at the hospital that he had tuberculosis.

3. That on February 11, four days earlier, when the release was signed, plaintiff was declared to be afflicted with an abscess of the lungs or with tuberculosis. In either event plaintiff's condition was serious.

4. That on February 11, 1939, Wilson knew from the statements contained in the abstract that Spillers was in a serious condition and wholly suppressed that information in negotiating the release with Spillers.

5. That Wilson procured the release from Spillers by fraud in suppressing the truth about Spillers' condition.

### Conclusion of Law

That procuring the release from a seaman discharging the shipowner from all liabilities by suppressing the truth as to his condition is fraud and renders the release void.

The $100 paid by defendant should be credited upon any amount finally awarded to plaintiff.

The release is invalid. An order to that effect may be submitted.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Rule 52 of the new Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.