JOHN GIBSON, Respondent, v AMERICAN EXPORT ISBRANDTSEN LINES, INC., Appellant.

First Department, February 17, 1987

### APPEARANCES OF COUNSEL

*Kenneth Heller* for respondent.

*Stephen K. Carr* of counsel *(Joseph V. Fleming* and *Geoffrey D. Ferrer* with him on the brief; *Haight, Gardner, Poor & Havens,* attorneys), for appellant.

### OPINION OF THE COURT

KASSAL, J.

Plaintiff, a seaman, commenced this action to recover for personal injuries under the Jones Act (46 USC § 688), allegedly sustained on February 1, 1970 when he suffered a myocardial infarction while employed as a night relief engineer aboard defendant's container vessel, *The C.V. Seawitch.* Plaintiff had been licensed as a third assistant engineer since 1944, but claimed to be unfamiliar with the engine room aboard *The Seawitch,* an automated vessel, although he had previously served aboard the ship as a night relief engineer and as an engineer on its second or third voyage.

He reported for duty, boarding the vessel at 9:00 P.M. on January 31, 1970. Shortly thereafter, he noticed that one of the three feed water pumps in the engine room was leaking lubricating oil. He claims he reported this to one of the ship's

regular engineers who was leaving the ship and who told him "[D]on't worry about it; we will take care of it; it's our job." As a result, he took no steps to correct the condition nor did he make a notation in the engine room logbook. He did, however, make a note on the blackboard—"Feed pump leaking"—before being relieved by another port relief engineer at midnight.

On February 1, 1970, plaintiff again reported for duty, this time at noon, relieving *The Seawitch's* port relief night engineer. On making his rounds, assisted by a deck engine mechanic (DeMac), he discovered that the feed pump was still leaking. He instructed the DeMac to keep an eye on the oil level in the pump, which would have to be checked with a dip stick. At about 2:15 or 2:30 P.M., he checked the feed pump and learned there was no lubricating oil, a condition which admittedly could have disastrous consequences in terms of the security and safety of the vessel. Next to the pump, he found a one quart can of oil, which was empty. "At that moment, I was beside myself so I ran up the ladder—I was very concerned would be a better way to put it—so I ran up the ladder —that would be one flight up to the machine shop—to get oil." The machine shop was locked, so, as a result, he ran about the ship, up and down stairs, about six levels, to locate a can of oil. Finding none, he went back down to the main engine room to look for the DeMac. Failing to locate him, he tried the C.O.2 room, also to no avail—"I was really desperate for oil at this point." Finally, in another room aft of the machine shop, he found a partially filled five-gallon can of oil, which he "grabbed", ran to the engine room, and "dumped it into the hole" of the feed water pump.

Immediately thereafter, he began to experience chest pains, sweating and shortness of breath—"I sat down and as I sat down, I got the weirdest sensation that ever happened to me. I got such a crushing pain in my chest and I started to sweat and shortness of breath and thought I was going to throw up * * * And my arm hurt * * * I was really in pain." He did not, however, report the incident to his relief night engineer— "I didn't even see him."

The next day, February 2, 1970, plaintiff returned to *The Seawitch,* which was moored at Staten Island, and stood an eight hour watch, from 4:00 P.M. to midnight. During the next two days, February 3 and 4, 1970, he unsuccessfully attempted to report to the ship, which had been shifted to an anchorage near the Verrazano Bridge. On the first day, February 3, the sea was too rough for a water taxi to take him to the ship. On

the second day, February 4, plaintiff returned to Pier 84 on the Hudson River, where the ship was to have been, but *The Seawitch* did not appear at its berth. When he arrived home on February 4, 1970, he began to experience "severe" pain and, as a result, his wife took him to Rahway Memorial Hospital in New Jersey. An electrocardiogram on February 6, 1970, revealed an acute anterior wall myocardial infarction. He remained hospitalized until February 28, 1970, thereafter receiving outpatient treatment.

During the ensuing months, plaintiff was unable to obtain employment because of his cardiac history and, it appears, he did receive maintenance and cure of $12 per day, until he was notified that defendant's physician had found him permanently unfit for duty, at which point he had already received total benefits of $2,172. Defendant's claims adjuster, Trimis, allegedly advised plaintiff on August 24, 1970 that the ship-owner's cardiologist, Dr. Eugene Clark, had classified him permanently unfit for sea duty. Trimis proposed an additional payment of $2,160, an amount equivalent to six months future sick pay. It appears from the record that, subsequently, plaintiff did consult an attorney, the law firm of Zwerling & Zwerling, which notified Trimis that it had been retained. However, more than two months later, on November 5, 1970, the same law firm advised Trimis that it no longer represented plaintiff.

On December 1, 1970, after being advised that his maintenance and/or sick benefits had terminated, plaintiff entered into discussions with defendant concerning a proposed settlement in the sum of $2,500. Defendant's claims agent, who was also an attorney, Tellefsen, offered $2,500 for plaintiff's executing a general release, which included a waiver of any further claims against the ship. Tellefsen admitted at his examination before trial that, before the release was signed, he did not show Dr. Clark's report to plaintiff nor did he explain to him the contents of the report and the opinion therein that he had sustained a major heart attack, had a high degree of cardiac disability and would probably never work on a ship in the future. While Tellefsen admitted that he did not discuss these matters with plaintiff, he claimed that plaintiff knew this in any event. The record does not reflect whether he fully explained all of the rights and remedies being surrendered as a result of the settlement and the release, including any remedy under the Jones Act, although, at one point in the transcript of his deposition, Tellefsen

states that, at the time, he considered that there was no liability.

Special Term struck the affirmative defenses of contributory negligence and general release, holding as to the former, that defendant had not offered any evidence to establish that plaintiff was negligent and, as to the latter, that the release was invalid on the facts adduced. In so concluding, it observed that the release had been executed at a time when plaintiff was not represented by counsel and was procured by defendant's claims agent, who was also an attorney, without disclosing to the seaman the contents of his medical reports as to the extent of his disability or fully apprising him of the legal rights which would be lost as a result of the settlement.

██ ██ While we recognize that it is defendant's burden to establish at trial that plaintiff was contributorily negligent and, as to the release, there is a heavy burden imposed on the shipowner, especially since seamen are wards of admiralty—*cestuis que trustent*—in a fiduciary relationship with the shipowner—these factual issues must await trial. They cannot be finally resolved on the papers before Special Term.

### RELEASE

As to the general release, it is well established that releases by seamen are subject to careful scrutiny by the courts. The shipowner must establish that the release was freely executed, without deception or coercion, and that it was made only after a full disclosure and with a full understanding of the rights relinquished thereby *(Garrett v Moore-McCormack Co.,* 317 US 239, 247-248; *Waters v United States,* 191 F2d 212, 215; *Bay State Dredging & Contr. Co. v Porter,* 153 F2d 827, 833; *The S.S. Standard,* 103 F2d 437, 438-439; *Spillers v South Atl. S.S. Co.,* 45 F Supp 2, 6-7).

Thus, in *Garrett v Moore-McCormack Co. (supra),* the United States Supreme Court, with reference to the validity of a release, held that the shipowner "must affirmatively show that no advantage has been taken; and his burden is particularly heavy where there has been inadequacy of consideration" (317 US, at p 247). Justice Black, writing for the unanimous court, observed: "The wardship theory has, as was recognized by the courts below, marked consequence on the treatment given seamen's releases. Such releases are subject to careful scrutiny. 'One who claims that a seaman has signed away his rights to what in law is due him must be prepared to

take the burden of sustaining the release as fairly made with and fully comprehended by the seaman.' *Harmon* v. *United States,* 59 F.2d 372, 373. We hold, therefore, that the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding" *(supra,* at pp 247-248).

Thus, these and other cases are uniform in holding that the validity of the release is, in large part, dependent upon the sufficiency of the disclosure to the seaman, so that it may be determined whether the release was executed freely and with a full understanding of rights. Plainly, taking into account defendant's burden and its fiduciary relationship to plaintiff, it must appear that, at the time of execution, the seaman was made to fully understand the extent of his debilitating condition and all of his rights which would be lost by virtue of the settlement, necessarily including any available remedy under the Jones Act. In *Bay State Dredging & Contr. Co. v Porter* *(supra,* at p 833), Circuit Judge Magruder observed: "Applying the foregoing to the present case, and bearing in mind that the insurance agent was negotiating with a seaman who was without benefit of counsel, we think the agent was under an obligation to bring home to the plaintiff an understanding of the rights he was giving up in exchange for the settlement offered. Otherwise, the plaintiff would necessarily not be in a position to make an intelligent decision as to whether the offer should be accepted. At the very least he should have been told that he had an unbeatable right of action under the maritime law for maintenance and cure, not dependent on proof of negligence; and that in addition he had, under the Jones Act, a right to maintain an action at law for damages for injuries resulting from the negligence of any of the officers or employees of the defendant".

■ Despite the strong language of the foregoing, on this record, we cannot finally determine the extent and sufficiency of the disclosure and whether plaintiff was fully apprised in terms of the validity of the release. Under these facts, the proper forum is a trial, not a motion for summary judgment. The record does not reveal the extent of the discussions or the degree to which plaintiff was aware of the nature of his physical condition and the rights affected by his executing the

release. Although it appears that he had been represented by counsel during a period of time prior to the settlement, the record does not disclose whether he had been fully informed by them of his remedies. Despite the conjecture by defendant on this issue, namely, that we may infer that the union and Messrs. Zwerling & Zwerling informed plaintiff of his rights and remedies, in our view, the issue presents a triable issue of fact. In addition, considering the extent of medical treatment rendered, whether plaintiff was aware, at the time of the release, of the full nature of his disability is for the trier of the facts, especially bearing in mind the limited function of the court on a motion for summary judgment as issue-finding, not issue-determination *(Cruz v American Export Lines,* 67 NY2d 1, 13; *Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395, 404).

### CONTRIBUTORY NEGLIGENCE

Plaintiff also contends that the affirmative defense of contributory negligence does not apply to these facts and that defendant has improperly interposed assumption of risk as a defense, albeit under the guise and rubric of contributory negligence. The law is clear that assumption of the risk is not a defense in maritime cases (46 USC § 688; 45 USC § 54; *see, Roberts v United Fisheries Vessels Co.,* 141 F2d 288, 292-293, *cert denied* 323 US 753; 2 Norris, Seamen § 30:33 [4th ed]). This is conceded by both parties. Similarly, it is well established that the courts will not permit a defense of assumption of risk to be raised, through the guise of contributory negligence *(Tiller v Atlantic Coast Line R. R. Co.,* 318 US 54, 58; *Byrd v Reederei,* 638 F2d 1300, 1304; *Reyes v Vantage S. S. Co.,* 558 F2d 238; *Rivera v Farrell Lines,* 474 F2d 255, 257, *cert denied* 414 US 822; *Ballwanz v Isthmian Lines,* 319 F2d 457).

In *Rivera v Farrell Lines (supra),* the United States Court of Appeals for the Second Circuit distinguished between assumption of risk and contributory negligence: "The distinction between assumption of risk and contributory negligence is well established. In common law days the knowledgeable acceptance by an employee of a dangerous condition when and if such acceptance was necessary for the performance of his duties was assumption of risk. 2 F. Harper and F. James, The Law of Torts, § 21.4 (1956). Contributory negligence, on the other hand, connotes some careless act or omission on the part of the employee over and above that knowledgeable accep-

tance. Mumma v. Reading Co., 247 F.Supp. 252, 256-257 (E.D.Pa. 1965). As the defense of assumption of risk has been abolished by statute—indeed, 'every vestige' of the doctrine 'obliterated,' Tiller v. Atlantic Coast Line Railroad Co., 318 U.S. 54, 58, 63 S.Ct. 444, 87 L.Ed. 610 (1943)—the first issue before us is whether the charge permitted assumption of risk to go to the jury in the guise of contributory negligence." (474 F2d, at p 257.)

While the distinction in a given case may be a very fine one and, at times, difficult in application, it has been consistently held, in these and other cases, that a shipowner may not rely on assumption of risk masquerading under another name, i.e., as contributory negligence. Thus, in *Rivera v Farrell Lines (supra),* a messman brought an action against the shipowner for injuries suffered when he fell on a wet pantry floor covered with soapy water as a result of defective drains, a condition he had complained about to the ship officers. The shipowner defended, claiming that the seaman's continuing to work in light of such known dangers amounted to contributory negligence. The court disagreed, holding that the theory—that the messman was continuously careless in moving in and about the pantry—"was really assumption of risk masquerading under another name, because it allowed a finding of contributory negligence on the strength of appellant's knowledge that a dangerous condition in his line of duty existed and his working in that line of duty" *(supra,* at pp 257-258).

The clear principle from all these cases is that a seaman may not be charged with contributory negligence for continuing to work in a situation and under conditions which he knew to be dangerous, since the actual basis and theory of such a defense is assumption of risk, not contributory negligence. *(See also, Rivera v Rederi A/B Nordstjernan,* 456 F2d 970, *cert denied* 409 US 876; *Sessler v Allied Towing Corp.,* 538 F2d 630, where the courts likewise precluded the assertion of contributory negligence as a defense in situations where the employee continued to work, although he knew a dangerous condition existed since, to apply the defense would be tantamount to holding that the employee, by continuing his work, assumed the risk of obeying orders.)

■ In our case, plaintiff, faced with a leaking feed water pump which had emptied of oil, was confronted with a potentially dangerous and volatile situation. He reacted to that condition by scurrying throughout the ship to locate a can of oil and claims to have suffered a myocardial infarction by

reason of the stress of this dire emergency. Defendant, on the other hand, contends that the emergency was not the competent producing cause of the heart attack, which was actually sustained in the hospital, days later. It relies, to some extent, on the hospital records. Clearly, this issue cannot be determined on a motion for summary judgment and must await the trial.

In the alternative, however, the shipowner argues that, taking into account all of the options available to plaintiff at the time, his response was not that of an ordinary prudent person. Thus, it points to the fact that, instead of rushing about the ship in an effort to locate oil, plaintiff could have easily engaged either of two other feed pumps, which were located in the engine room, within five feet of the malfunctioning pump. At his deposition, plaintiff admitted that he was familiar with the procedure to open the discharge/suction valves and start this pump, a process which would normally take a matter of minutes with two men working together, but which could also be done by one man. He described the precise procedure to be employed. According to defendant, another alternative which plaintiff did not attempt, was to tap lube oil off the main oil piping system, a system which carried 800 gallons of oil for storage. Defendant contends that either procedure would have been in conformity with good engineering practice and either would have been far preferable to plaintiff's response here.

In our view, the reasonableness of plaintiff's reactions and whether they were those which would have been followed by an ordinary prudent man, with plaintiff's training and experience, cannot be resolved on this record and must await the trier of the facts. It is conceded that contributory negligence is not a complete defense, but may be considered only in mitigation or diminution of damages (see, Socony-Vacuum Co. v Smith, 305 US 424, 429; 46 USC § 688; 45 USC § 53; see also, Pope & Talbot v Hawn, 346 US 406; Martinez v United States Lines Co., 1 AD2d 875, lv denied 1 NY2d 643), so that the comparative fault issues raised by the shipowner are matters for trial, not summary judgment.

### SUMMARY DISMISSAL OF COMPLAINT

While defendant, in its appellate review, requests that we search the record and grant summary judgment dismissing the complaint, the issue is not properly before us. No motion

for that relief was made and the notice of appeal limits the appeal to so much of the order as dismissed the affirmative defenses. Contrary to the representation made on oral argument, neither the notice of appeal nor the preargument statement raises the issue. In any event, the cause of plaintiff's myocardial infarction and when it was sustained in relation to his experience on board the ship are matters for trial and cannot be finally determined on the conflicting medical proof and affidavits in this record.

As repeatedly held, the remedy of summary judgment is a drastic one, which should not be granted where there is any doubt as to the existence of a triable issue *(Moskowitz v Garlock,* 23 AD2d 943, 944) or where the issue is even arguable *(Barrett v Jacobs,* 255 NY 520, 522), since it serves to deprive a party of his day in court. Relief should be granted only where no genuine, triable issue of fact exists *(see, Werfel v Zivnostenska Banka,* 287 NY 91).

Accordingly, the order, Supreme Court, New York County (Bruce McM. Wright, J.), entered May 29, 1985, which granted plaintiff's motion pursuant to CPLR 3211 (b) and dismissed the affirmative defenses of general release and contributory negligence, should be reversed, on the law, without costs or disbursements, the motion denied and the defenses reinstated.

SANDLER, J. P., ROSENBERGER and WALLACH, JJ., concur.

Order, Supreme Court, New York County, entered on or about May 29, 1985, unanimously reversed, on the law, without costs and without disbursements, plaintiff's motion pursuant to CPLR 3211 (b) denied and the defenses reinstated.