OPINION OF THE COURT
David B. Cohen, J.
Introduction and Procedural History
This holdover summary proceeding was commenced by service and filing of a notice of petition and petition, dated October 4, 2005, by petitioner landlord, Little West 12th Street Realty L.P, seeking a final judgment of possession of the second and third floors at 32 Gansevoort Street, New York, New York. Petitioner also seeks a money judgment for $17,136.94 in rent arrears, with interest from August 1, 2005, and postpetition use and occupancy. Petitioner claims that respondent tenant, Vincent Inconiglios, is holding over after the termination of his month-to-month tenancy which arose after his lease expired on January 31, 2005.
Following discovery by both parties, respondent now moves, pursuant to CPLR 3212 (a), for summary judgment dismissing the petition based on respondent’s first affirmative defense, that respondent’s apartment is covered by, and respondent is protected by, Multiple Dwelling Law article 7-C (the Loft Law). As such, petitioner may not evict him as a month-to-month tenant upon 30 days’ notice of termination and therefore the petition must be dismissed.
Respondent’s motion asks this court to find, as a matter of law, that the premises are covered under the Loft Law and that petitioner has failed to raise a material issue of fact or legal basis sufficient to deny the motion.
Factual Background
The building is a commercial artist studio building located in the meat-packing district. The certificate of occupancy, issued in 1961, provides for a store on the first floor and fine art studios on the second through fifth floors. The building is located in a manufacturing district (Ml-5) under the New York City Zoning Resolution which allows for manufacturing, commercial or warehouse purposes.
Respondent has submitted his own affidavit attesting to his residential use of the premises since 1970, as well as the af *510 fidavits of six individuals who were either building tenants, occupants, or employees — Marjorie Morrow, Jill Sotnick, Edwin Krales, Joseph Barnes, Hans Gransjean, and Penelope Naylor. Respondent has also submitted documentary evidence, including, but not limited to: copies of the 1961 certificate of occupancy for the building, zoning map covering the building, respondent’s Consolidated Edison record of his account for the premises, respondent’s leases for the premises from 1972, leases of other building tenants, a transcript of the deposition of petitioner’s agent, Delfi Soto, an October 14, 2007 New York Times article regarding respondent’s residence at the building and in the neighborhood (entitled What a Difference 38 Years Make), and numerous documents pertaining to his claimed primary residence at the building.
Respondent first moved into the building in 1969 when he sublet a space in a collective artists’ studio on the second floor, while residing elsewhere in the East Village. In or around July 1970 respondent gave up his East Village residence and moved into the third floor of the building which had previously been occupied by the filmmaker Robert Downey, Sr. Respondent contends that since the third floor was already set up for living with a full kitchen (stove, refrigerator, sink) and bathroom (sink, shower, toilet), he immediately started living in the third floor loft. Respondent claims he obtained telephone service, and has documentation from Consolidated Edison that he has had a residential gas and electric account in his name at the premises since 1970.
Respondent has lived at the premises as his primary residence since 1970. He initially lived there with his former wife, Marjorie Morrow, who vacated in the late 1970s, and currently lives with his partner, Donna Rafferty. Although initially without a lease, respondent obtained a written lease for the third floor commencing October 1, 1972, which respondent has renewed multiple times over the years. Although the certificate of occupancy allowed for use of the third floor as an artist’s studio, respondent’s leases, commencing February 1, 1976, describe the third floor unit as a “studio and caretaker’s apartment.”[1]
On April 1, 1976, respondent entered into a separate lease for the second floor loft. Although the spaces are not physically *511 connected, respondent uses the second and third floors as an integrated whole as his primary residence. The second floor has a small kitchen, a bathroom with a shower, and a pull-out couch, and also serves to house the office of respondent’s business, Apptex International, a graphic arts and design firm. The second floor also contains the couple’s antiques, extensive library, and many collectibles and fine art pieces.
In 1988, respondent also took over the lease for the fifth floor premises, which he sublet to Hans Gransjean and other tenants until 2005. Respondent also attests to personal knowledge of the residential uses of the fourth and fifth floors of the building from 1970 through 2005, including during the relevant window period, April 1, 1980 through May 1, 1987.* [2]
Penelope Naylor’s affidavit states that she lived on the fourth floor of the building from 1979 through early 1985. She sublet the space, which consisted of the subdivided back portion of the fourth floor, from the prime tenant Jerry Samuels.[3] Francois Gerard Matthys resided with her during part of that time. In 1985 Naylor was married but continued to reside in the fourth floor space for at least one week per month when she was in Manhattan. When Samuels moved part of his studio to upstate New York, Naylor made an arrangement with Samuels to share the fourth floor back space when she was not there. Samuels came to New York regularly during the week. Naylor and Samuels continued this space sharing arrangement until she gave up the space after 1991.
When Naylor first moved in, the fourth floor space was already set up for residential use, including a kitchen (with stove, refrigerator, sink, countertop, cabinets), a bathroom (toilet, sink, shower) and a bedroom. At all times throughout her sublet from Samuels, from 1979 through 1991, “the 4th floor . . . was fully set up for living and was used accordingly by myself, Jerry Samuels and friends” (Naylor affidavit ¶ 6). Naylor also *512 confirms the residential use of the third floor by respondent from 1979 and the fifth floor by Hans Gransjean from 1979.
Hans Gransjean’s affidavit states that he has lived on the fifth floor of the building since 1979. Until 1988, he sublet the space from the prime tenant, Joseph Barnes, who lived nearby. During this period, the fifth floor was his only residence. Gransjean resided on the fifth floor with his wife and son and also conducted his business, Custom Ceramics, out of the space. After 1988, Gransjean sublet the same space from respondent, who took over the fifth floor lease from Barnes.[4]
When Gransjean first moved in, the fifth floor space was already set up for residential use, including a kitchen, bathroom and bedroom. Gransjean significantly upgraded the space while he lived there, renovated the kitchen (which included a stove, refrigerator, sink, countertop, cabinets) and bathroom (adding his custom ceramics to the large shower stall), and rebuilt the bedroom walls. Gransjean also attests to the residential use of the third floor by respondent from 1979 and the fourth floor by Penelope Naylor from 1979.
The remaining affiants — Marjorie Morrow, Jill Sotnick, Edwin Krales, and Joseph Barnes — who are either former tenants of, or employees who worked in, the building, in sum and substance support and corroborate the factual allegations made by respondent, Naylor and Gransjean concerning their use of their premises for residential purposes from April 1, 1980 through May 1, 1987.
In opposition, petitioner has provided its attorney’s affirmation and the affidavit of Delfi Soto, who since 1981 has been involved in the management of the building. From 1981 to 1992, Ms. Soto was employed by petitioner’s previous managing agents, Hines and Hines and James Kelly. From 1993 to the present, Ms. Soto has been the office manager of Robert L. Cancellare Realty, Inc., petitioner’s current managing agent. Petitioner also submits copies of leases with respondent and other tenants and a transcript of respondent’s deposition.
Conclusions of Law
Summary Judgment
Under CPLR 3212, a motion for summary judgment shall be denied if, following presentation of the relevant facts, there *513 remains sufficient controversy over any material issue of fact sufficient to require a trial. The party seeking summary judgment must show upon the evidence that no material issue of fact remains for trial (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]; see also Gonzalez v 98 Mag Leasing Corp., 95 NY2d 124, 129 [2000]). Conclusory assertions are not sufficient to defeat a motion for summary judgment (McGahee v Kennedy, 48 NY2d 832, 834 [1979]). Where a party has met his or her prima facie burden to establish entitlement to judgment as a matter of law, the burden shifts to the opposing party to “produce evidentiary proof in admissible form establishing the existence of material questions of fact” (Alvarez v Prospect Hosp., 68 NY2d 320, 326-327 [1986]).
The Loft Law
In 1982, article 7-C (§ 280 et seq.) of the Multiple Dwelling Law was enacted “to regulate the occupancy of space converted from nonresidential to residential use, and to encourage landlords to bring converted occupancies into code and zoning compliance” (Loft Realty Co. v Aky Hat Corp., 123 Misc 2d 440, 444 [Civ Ct, NY County 1984], affd 131 Misc 2d 541 [App Term, 1st Dept 1984]). Tenants whose units qualify for protection under the Loft Law are protected from eviction by reason of illegal occupancy, violation of a lease provision prohibiting residential use, or the lack of a residential certificate of occupancy (Multiple Dwelling Law § 286 [1]). Such tenants are also “entitled to continued occupancy, provided that the unit is their primary residence” (Multiple Dwelling Law § 286 [2] [i]).[5] The original Loft Law required, among other things, that “three or more families living independently of one another” have occupied the premises for residential purposes between April 1, 1980 to December 1, 1981 (the original window period) {see Multiple Dwelling Law § 281 [1] [iii]). Buildings covered under the Loft Law are de facto or “interim” multiple dwellings {see Multiple Dwelling Law §§ 280, 281 [l]).[6] The 1982 Loft Law was *514 enacted with a built-in expiration date, which has been periodically amended and extended.* ****[7]
As originally enacted, the 1982 Loft Law applied only to buildings located in an area in which the local zoning regulation permitted residential use as a matter of right or by minor modification (see Multiple Dwelling Law § 281 [2] [i]) and occupied at some time in the past for manufacturing, commercial or warehouse purposes (see Multiple Dwelling Law § 281 [1] [i]). The subject building was excluded from the original Loft Law by virtue of its location in a manufacturing, commercial or warehouse zone.
In 1987, the Loft Law was amended to allow units that were residentially occupied during the original window period and residentially occupied on May 1, 1987 to qualify for coverage even though their residential use was not permitted by local zoning resolution (see Multiple Dwelling Law § 281 [4]). As amended in 1987, interim multiple dwellings covered under the Loft Law include buildings that had at least one residential occupant on May 1, 1987 and that had three or more units that had been occupied for residential purposes during the original window period (Multiple Dwelling Law § 281 [4]). The 1987 amendments expanded coverage to units that previously would not have qualified under the original Multiple Dwelling Law (see e.g. Multiple Dwelling Law § 281 [1], [2] [i], [iii], [iv]; see generally 4-30 NY Practice Guide: Real Estate § 30.02 [Matthew Bender & Co. 2007]). The Loft Law also provides that a reduction in the number of occupied residential units in a building after December 1, 1981 “shall not eliminate the protections of [the Loft Law] for any remaining residential occupants qualified for such protections” (Multiple Dwelling Law § 281 [3]). As clarified by the New York City Loft Board regulations, the 1987 amendments required that at least one unit be continuously occupied for residential purposes from the original window period through May 1, 1987 (29 RCNY 2-08 [c] [2]).
Respondent claims coverage under the Loft Law asserting that the premises meet all of the conditions set forth in both *515 the 1982 and 1987 Loft Laws. In order to prevail on his summary judgment motion, respondent must demonstrate residential use of at least three of the units in the building on April 1, 1980 continuously through December 1, 1981 (see Laermer v New York City Loft Bd., 184 AD2d 339 [1st Dept 1992]). In addition, since this building was located in a manufacturing zone, the enactment of the 1987 Loft Law is applicable and thus respondent must also show the continuous residential occupancy of at least one unit from April 1, 1980 through May 1, 1987 (the entire window period) (Multiple Dwelling Law § 281 [4]). Residential Use
Loft Board regulations provide that, in order to qualify as residential, the unit must have “attributes of independent living” such as:
“A separate entrance providing direct access to the unit from a street or public area, such as a hallway, elevator or stairway within a building;
“One or more rooms arranged to be occupied by the members of a family, which room or rooms are separated and set apart from all other rooms within a building; and
“Such other indicia of independent living which demonstrate the unit’s use as a residence of a family.” (29 RCNY 2-08 [a].)
In determining what constitutes “residential” use, the First Department, in reviewing a determination by the Loft Board, found that:
“To come within the protective scope of the Loft Law, it must be established, inter alia, that a structure or portion thereof, formerly used for commercial purposes, was, between April 1, 1980 and December 31, 1981 (the window period), occupied for residential purposes as the residence or home of any three or more independently living families (Multiple Dwelling Law § 281). For a unit to qualify as a residence under Multiple Dwelling Law § 281 it must possess sufficient indicia of independent living to demonstrate its use as a family residence (coverage regulation promulgated pursuant to Multiple Dwelling Law § 281). It is then not enough to show residential use alone. The showing of residential use must be accompanied by a showing that the formerly commercial premises, the domestic use of which is claimed, physically reflect that use, i.e., that the *516 premises have been converted, at least in part, into a dwelling (see, Loft Realty Co. v. Aky Hat Corp., 123 Misc 2d 440 [Civ Ct, NY County], affd 131 Mise 2d 541 [App Term, 1st Dept]).” (Anthony v New York City Loft Bd., 122 AD2d 725, 727 [1st Dept 1986]; see also Franmar Infants Wear v Rios, 143 Misc 2d 562, 564 [App Term, 1st Dept 1989].)
Respondent contends that both he and the tenants of the fourth and fifth floors have utilized their respective units sufficiently in a manner which supports a finding that the units are residential. In support of his claim, respondent has submitted credible sworn affidavits from himself and six other tenants or neighbors. Upon review of the affidavits and other evidence, the court finds that respondent has demonstrated:
(a) that he has continuously occupied the third floor for residential purposes since 1970 to the present, including during the entire window period, and that the third floor space was and has been since 1970 set up for actual living purposes with, among other things, a full kitchen, full bathroom and bedroom or sleeping area;
(b) that the fourth floor rear space was continuously occupied by a succession of individuals for residential purposes from at least 1970 and, specifically, by Penelope Naylor during the entire window period; and that the fourth floor rear space was and has been since 1970 set up for actual living purposes during the relevant time period with, among other things, a full kitchen, full bathroom and bedroom or sleeping area; and
(c) that the fifth floor was continuously occupied by a succession of individuals for residential purposes from at least 1970 and, specifically, by Hans Gransjean during the entire window period; and that the fifth floor space was and has been since 1970 set up for actual living purposes during the relevant time period with, among other things, a full kitchen, full bathroom and bedroom or sleeping area.
Petitioner disputes the residential use of these units, arguing: (1) that the units cannot be residential because they were not the primary residences of several of the tenants; (2) that the protections of the Loft Law cannot apply to subtenants; and (3) that the landlord did not consent to the subtenancies or to the residential use of the commercial space. These arguments are unavailing.
First, the initial determination regarding Loft Law coverage depends on whether three or more units were occupied for resi *517 dential purposes during the window period, not on whether they were occupied as the primary residences of their tenants (Matter of VLachos v New York City Loft Board, 70 NY2d 769, 770 [1987]; Kaufman v American Electrofax Corp., 102 AD2d 140, 143 [1st Dept 1984]). Thus, even if the tenants of the disputed units maintained their primary residences elsewhere, this factor would not be dispositive of whether the building was covered by the Loft Law.[8] Second, the protections of the Loft Law apply to subtenants as well as prime tenants (see 29 RCNY 2-09 [b] [2]; 545 Eighth Ave. Assoc. v New York City Loft Bd., 232 AD2d 153, 154 [1st Dept 1996], Iv denied 89 NY2d 807 [1997]; see also Dworkin v Duncan, 116 Misc 2d 853, 863 [Civ Ct, NY County 1982]). Finally, there is no requirement under the Loft Law that the landlord consent to the subtenancy (545 Eighth Ave. Assoc., 232 AD2d at 154 [coverage under Loft Law does not depend on landlord’s knowledge or consent to subtenancy, as long as occupant was in possession prior to July 27, 1987]; Matter of Korn v Batista, 131 Mise 2d 196 [Sup Ct, Special Term, NY County 1986], affd 123 AD2d 526 [1st Dept 1986] [units occupied by subtenants counted toward three units required to be occupied as dwellings for coverage under Loft Law, although subtenants who came into residency after January 1, 1983 without landlord’s consent are not protected; the Loft Law was designed to protect those tenants living in precarious living arrangements prior to the effective date, not to encourage new ones]), nor is there any requirement that the landlord consent to the residential use of the commercial spaces (545 Eighth Ave. Assoc., 232 AD2d at 154; Kaufman, 102 AD2d at 143).
While petitioner contends that respondent has failed to establish that the three units at issue were predominantly residential, the proof submitted by respondent is sufficient to establish the substantial residential use of the third, fourth and fifth floor units to satisfy the requirements for Loft Law coverage (cf. Anthony, 122 AD2d 725 [1986]; Franmar Infants Wear, 143 Misc 2d 562 [1989]; Aky Hat Corp., 123 Misc 2d 440 [1984]; see also Wasserman v Carella, 307 AD2d 225, 226 [1st Dept 2003] [proponent of summary judgment motion must tender sufficient evidence to demonstrate there are no material issues of fact in dispute]).
*518 Petitioner denies that the apartments are residential, but has produced no credible evidence to support that contention. Significantly, Ms. Soto’s affidavit does not credibly rebut or raise an issue of material fact as to whether the third, fourth and fifth floor units were residentially occupied; or that the units were configured for residential use; or that the units possessed a bathroom, kitchen and bedroom or sleeping area. The Soto affidavit also does not credibly call into question that Hans Gransjean lived on the fifth floor as his residence during the entire window period with his wife and son; that Penelope Naylor lived on the fourth floor as her residence during the entire window period; nor that respondent lives on the second and/or third floors as his residential home. Ms. Soto, who has been involved in managing the premises since 1981, would likely be in a position to refute the respondent’s factual claims, but has not done so. Ms. Soto’s affidavit has failed to rebut the residential uses of the building during the entire window period. Therefore, petitioner fails to articulate any material question of disputed fact concerning whether the subject building is covered by the Loft Law.
Although summary judgment is a drastic remedy and should only be granted cautiously (Andre v Pomeroy, 35 NY2d 361, 364 [1974]; Broadway — 111th St. Assoc, v Morris, 160 AD2d 182 [1st Dept 1990]; West 157th St. Assoc, v Sassoonian, 156 AD2d 137 [1st Dept 1989]; Gibson v American Export Isbrandtsen Lines, 125 AD2d 65 [1st Dept 1987]), it is appropriate here where petitioner has failed to proffer any credible evidence in opposition to respondent’s showing of residential occupancy of the requisite number of units during the relevant window period. Here, respondent has demonstrated that there are no triable issues of material fact regarding the residential use of three building units.
Housing court has concurrent jurisdiction with the Loft Board to determine Loft Law coverage (Missry v Ehlich, 1 Misc 3d 723, 730-731 [Civ Ct, NY County 2003]). The third floor (respondent’s unit), fourth floor (rear), and fifth floor of the building located at 32 Gansevoort Street, New York, New York, are residential units under the Loft Law, as amended, and the building is therefore covered as an “interim multiple dwelling” under the Loft Law. Accordingly, as respondent is entitled to the protections of the Loft Law and may only be evicted in accordance with the Loft Law or Loft Board regulations (see Multiple Dwelling Law art 7-C), petitioner cannot maintain this proceed *519 ing and the petition must be dismissed (see 840 W. End Assoc. v Zurkowski, NYLJ, Feb. 28, 1991, at 24, col 4 [App Term, 1st Dept]).
Petitioner has, therefore, also failed to comply with RPAPL 711 and 741, which require that the petition accurately set forth the rent-regulated status of the unit for which possession is sought to be recovered (see RPAPL 711, 741; see also 22 NYCRR 208.42 [g] [accurate multiple dwelling status of premises required to be set forth in petition]). For this reason also, the petition must be dismissed (see MSG Pomp Corp. v Doe, 185 AD2d 798, 800 [1st Dept 1992] [dismissing petition for failure to comply with RPAPL 741 by misstating rent regulatory status of premises]; 840 W. End Assoc, v Zurkowski, NYU, Feb. 28, 1991, at 24, col 4 [dismissing petition where landlord failed to allege proper rent-regulated status of premises]).
Conclusion
Accordingly, for the reasons set forth herein, the court finds that the subject building is covered under the Loft Law. Respondent’s motion for summary judgment upon his first affirmative defense is granted, and the petition is dismissed.

. Copies of respondent’s leases covering the period from February 1, 1976 through January 31, 1990 and from February 1, 1995 through January 31, 2005 describe the third floor premises as a “studio and caretaker’s apartment.” Respondent’s lease for the third floor during the period February 1,
*511 1979 through January 31, 1982 has the “no living” clause to the lease rider crossed out and initialed by both respondent and petitioner’s agent.

. When respondent first moved into the premises in 1970, the fifth floor was residentially occupied by Peter Watts and his family, and subsequently by Carol Baldwin and Dan Geary, both of whom lived in the space. In 1970, the fourth floor rear was also residentially occupied by Frank Ordway and his partner, Nina Katz, while Gandy Brody lived in the fourth floor front. Respondent attests that both fourth and fifth floor spaces were outfitted for residential use at that time, with kitchens, bathrooms, and bedrooms.

. Respondent’s affidavit states that Jerry Samuels, who is now deceased, used the front portion of the fourth floor as his studio.

. According to respondent, Gransjean’s fifth floor subtenancy ended in 1994.

. The broad remedial purpose of the Loft Law is to confer rent-stabilized status on legalized interim multiple dwellings (Matter of 91 Fifth Ave. Corp. v New York City Loft Bd., 249 AD2d 248, 249 [1st Dept 1998], appeal dismissed 92 NY2d 890 [1998]).

. The Loft Law defines an “interim multiple dwelling” as: “any building or structure or portion thereof located in a city of more than one million persons which (i) at any time was occupied for manufacturing, commercial, or warehouse purposes; and (ii) lacks a certificate of compliance or occupancy pursuant *514 to section three hundred one of this chapter; and (iii) on December first, nineteen hundred eighty-one was occupied for residential purposes since April first, nineteen hundred eighty as the residence or home of any three or more families living independently of one another” (Multiple Dwelling Law § 281 [1]).

. The Loft Law has been extended through May 31, 2008 (L 2007, ch 62, §1).

. However, the tenant must use the unit as his primary residence in order to continue to be eligible for Loft Law protection (see Multiple Dwelling Law § 286 [2] [i]).